DEDHAM WATER COMPANY and
Dedham–Westwood Water District,
Plaintiffs, Appellants,

v.

CUMBERLAND FARMS DAIRY, INC.,
et al., Defendants, Appellees.

No. 88–2080.

United States Court of Appeals,
First Circuit.

Heard April 3, 1989.

Decided Nov. 2, 1989.

As Modified on Denial of
Rehearing Dec. 11, 1989.

Rehearing En Banc
Denied Dec. 11, 1989.

Thomas F. Holt, Jr., with whom Nancy B. Reiner, DiCara, Selig, Sawyer & Holt, Boston, Mass., John R. Cope and Bracewell & Patterson, Washington, D.C., were on brief, for plaintiffs, appellants.

Allan van Gestel with whom Henry C. Dinger, Christopher P. Davis, A. Lauren Carpenter and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

This is an appeal by plaintiff-appellant Dedham Water Company from a judgment of the district court holding that defendant-appellee Cumberland Farms Dairy, Inc. was not liable to plaintiff under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), the Clean Water Act (CWA), the Resource Conservation and Recovery Act (RCRA), and the Massachusetts Oil and Hazardous Material Release Prevention and Response Act (Mass.Gen.L. ch. 21E).

On October 21, 1982, Dedham Water filed suit in district court against Cumberland Farms alleging violations of CERCLA, CWA, RCRA and state statutory and common law environmental requirements. The suit sought injunctive relief, response costs, and damages due to Cumberland Farms' unlawful releases and threatened releases of hazardous substances. In 1985, the district court dismissed the case, but on appeal that order was reversed, and the claims were reinstated on November 14, 1986. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074 (1st Cir. 1986).[1] After the initial dismissal of its claims, Dedham Water filed new complaints in February and March, 1986, including a new claim under the Clean Water Act. All the prior actions ultimately were consolidated into one action, the "Consolidated Complaint." On May 6, 1987, Dedham Water filed a Motion for Summary Judgment on the CERCLA and RCRA counts, which was denied by the district court. A jury-waived trial began on November 19, 1987. On August 4, 1988, the district court entered a Final Judgment in favor of Cumberland Farms. *Dedham Water Co. v. Cumberland Farms, Inc.*, 689 F.Supp. 1223 (D.Mass.1988). We va-

---

1. The district court granted defendant's motion to dismiss for lack of jurisdiction, because Dedham Water had not complied with the 60 day notice provision prescribed in CERCLA, 42 U.S.C. § 9612(a), and had not complied with the 60 day notice requirement in RCRA, 42 U.S.C. § 6972. *Dedham Water Co. v. Cumberland Farms, Inc.*, 643 F.Supp. 667 (D.Mass.1986). On appeal, we reversed and held that: (i) a party seeking to recover response costs under CERCLA § 9607 need not comply with the 60 day notice period when it does not seek reimbursement of its response costs from the Superfund, and (ii) the 1984 amended version of RCRA which eliminated the 60 day notice requirement for cases involving hazardous waste violations applied retroactively.

cate the judgment of the district court and remand for a new trial.

## BACKGROUND

Dedham Water (and its successor, the Dedham–Westwood Water District), a regulated public water utility, supplies drinking water to approximately 40,000 persons in the towns of Dedham and Westwood in Massachusetts. The primary source of plaintiff's water supply is the White Lodge Well Field, consisting of four wells, located on the west bank of the Neponset River in Westwood. Cumberland Farms has a truck maintenance facility located in Canton, Massachusetts, approximately 1,000 feet south of the White Lodge Well Field, on the east bank of the Neponset River. The Shield Packaging Company is also located in Canton on the east bank of the Neponset River, approximately 2,000 feet southwest of the White Lodge Well Field, in what is called the Industrial Park area. Also nearby is the New Neponset Valley Sewer, operated by the Massachusetts Water Resources Authority, which runs south to north along the east bank of the Neponset River.

Cumberland Farms, in servicing its trucks, used substantial quantities of solvents and degreasers containing volatile organic chemicals (VOCs).[2] Cumberland Farms' personnel testified that Cumberland Farms' mechanics regularly dumped these solvents and liquid wastes directly into drains and catch basins. These drains and catch basins are connected to a drainage pipe owned by Cumberland Farms known as the Northwest Storm Sewer Outfall (NWSSO), which in turn discharges directly into a drainage ditch, which flows towards the White Lodge Well Field, and ultimately discharges into the Neponset River. Cumberland Farms has on its property its own water well which it used for its truck maintenance work.

It has been stipulated that in early March, 1979, Dedham Water discovered that White Lodge Wells # 3 and # 4, the wells closest to the Cumberland Farms' facility, were contaminated with VOCs, including trichloroethane, trichloroethylene, dichloroethane, dichloroethylene, and tetrachloroethylene. Based upon a survey it made of the surrounding surface waters, Dedham Water believed that Cumberland Farms was the source of the contamination of White Lodge Wells # 3 and # 4. Dedham Water informed the Massachusetts Department of Environmental Quality Engineering (DEQE) of the problem, which then assumed responsibility for the investigation. In April, 1979, Dedham Water removed Wells # 3 and # 4 from service, and the DEQE issued a notice that these wells were not to be used to supply water for drinking.

Cumberland Farms continued to dispose of solvents and degreasers directly into its drains after it was made aware of the contamination at the White Lodge Well Field. After Dedham Water notified Cumberland Farms of the contamination of Dedham's wells, the DEQE, in June, 1979, notified Cumberland Farms that tests the DEQE had conducted in June 1979 revealed that Cumberland Farms' own well was contaminated with trichloroethane and trichloroethylene. Following a meeting between the DEQE and Cumberland Farms on August 22, 1979, the DEQE informed Cumberland Farms by letter dated September 4, 1979, that Cumberland Farms was to analyze the water coming from Cumberland Farms' own production well, and was to send the results to the DEQE, so that any levels in excess of the drinking water standards could be determined and appropriate action taken. Cumberland Farms analyzed water samples from its well in September, 1979, and the results showed that its well was contaminated with VOCs. Cumberland Farms has conceded that until April, 1982, when its well was permanently shut down, it continued to use the contaminated well water for washing its trucks and continued to discharge the water into its catch basins which flowed into the NWSSO.

---

**2.** The solvents and cleansers included: Safety-Kleen Mineral Spirits Solvent 105, Permatex, Gunk Hydroseal and NeverSeez. They contain

VOCs such as trichloroethane, trichloroethylene, dichloroethane, and tetrachloroethylene.

Dedham Water took various steps to prevent contamination of the other wells in the White Lodge Well Field. On June 1, 1979 wells # 3 and # 4 were pumped to waste. It hired Calgon Corporation in August of 1979 to determine if the contamination could be removed from the wells. In September of 1979 Dedham Water retained the engineering firm of Metcalf and Eddy to find a solution to the well pollution problem. Its ultimate recommendation was that a water treatment plant be built. In October, 1981, Dedham Water retained the services of Geraghty & Miller, a hydrogeology firm, to determine if the VOCs that had been released and were continuing to be released by Cumberland Farms had migrated and would continue to migrate into the White Lodge Well Field.

The DEQE conducted further investigations in 1981–1982. It is undisputed that the samples from the NWSSO discharge, the Cumberland Farms' well, and the Cumberland Farms' manhole, all revealed extremely high levels of VOCs. A representative of the DEQE testified at trial: that the DEQE had concluded that several of the VOCs found in White Lodge Well # 3 were also found in the discharge from the Cumberland Farms storm drain; that there was a hydrogeological connection across the river, so that any water pumped from the White Lodge Well Field would be drawn from the other side of the river; and that Cumberland Farms was a source of groundwater VOC contamination of the White Lodge Well Field. In February, 1982, the Massachusetts Attorney General and Cumberland Farms entered into an agreement under which Cumberland Farms was to conduct a hydrogeological study of the Cumberland Farms' site. Cumberland Farms, however, never conducted such a study. On April 8, 1982, the DEQE and the Massachusetts Attorney General brought suit in Suffolk County Superior Court against Cumberland Farms to stop the discharge of hazardous substances from the Cumberland Farms' NWSSO, alleging violations of various environmental regulations. This suit was eventually settled in August, 1987, by a consent decree.

In 1985, Dedham Water approved Metcalf & Eddy's earlier recommendation for a water treatment plant, and the plant went into service on March 25, 1987.

### The District Court Opinion

The district court held that the Cumberland Farms facility was not the source of contamination of the White Lodge Well Field. The court found that the Shield Packaging Company and the New Neponset Valley Sewer were "probable" causes of the White Lodge Well Field VOC contamination. It held that under CERCLA, in "two-site" cases, a plaintiff has to prove that the hazardous wastes released by a defendant have actually migrated to and contaminated the plaintiff's site in order for the defendant to be found liable. The court also held that this type of causal nexus had to be present for the CWA, RCRA, and Massachusetts statutory claims as well. Because the court found that Dedham Water had not proven that the contaminants released by Cumberland Farms had migrated to the wells of Dedham Water, it held that Cumberland Farms was not liable for the expenses incurred by Dedham Water in investigating the cause of the pollution to its wells and rectifying it.

### The Issues on Appeal

Dedham Water has not appealed the finding made by the district court that hazardous substances released by Cumberland Farms did not physically migrate onto Dedham Water's well field and contaminate it. It is Dedham Water's position that the actual releases of hazardous substances by Cumberland Farms onto its own property, even if they did not migrate to the wells owned by Dedham Water, and the threatened releases of hazardous substances by Cumberland Farms, caused the response costs that it incurred and that these costs are recoverable.

We reject Cumberland Farms' contention that the issue of response costs for actual and threatened releases was not brought up in the proceedings below. This issue was specifically raised in: the Complaint;

the Plaintiff's Motion for Partial Summary Judgment; the Plaintiff's Proposed Findings of Fact and Rulings of Law; the Plaintiff's Opening Statement; and the trial proceedings. Moreover, the district court in its opinion made clear that it was aware of the response cost provision in CERCLA when it said in effect that it did not apply in a "two-site" situation.

The central question on appeal is whether, under CERCLA, the plaintiff must prove that a hazardous substance released by the defendant's facility physically migrated onto the plaintiff's property, causing contamination of the well field, or whether it is sufficient for the plaintiff to prove that there were releases or threatened releases of a hazardous substance from defendant's facility which caused the plaintiff reasonably to incur response costs, regardless of whether physical migration actually occurred. We vacate the judgment of the district court and remand.

### CERCLA

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601, *et. seq.* (1983 and Supp.1989), was enacted to address the growing problem of toxic wastes. It is a broad response and reimbursement statute. It imposes strict liability on responsible parties. *See, e.g., United States v. Monsanto,* 858 F.2d 160, 167 (4th Cir. 1988) ("We agree with the overwhelming body of precedent that has interpreted [CERCLA] as establishing a strict liability scheme."), *cert. denied,* —— U.S. ——, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Violet v. Picillo,* 648 F.Supp. 1283, 1290 (D.R.I. 1986) ("Courts have universally acknowledged that ... Congress created a strict liability scheme.").

■ The statute specifically provides for a private right of action. There are four elements necessary for a prima facie case in a private-party lawsuit under CERCLA:

1. The defendant must fall within one of four categories of covered persons. 42 U.S.C. § 9607(a).

2. There must have been a "release or threatened release" of a hazardous substance from defendant's facility. 42 U.S.C. § 9607(a)(4); § 9601(14), (22).

3. The release or threatened release must "cause[ ] the incurrence of response costs" by the plaintiff. 42 U.S.C. § 9607(a)(4).

4. The plaintiff's costs must be "necessary costs of response ... consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B); § 9601(23)–(25).

*See Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1278 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988).

#### A. Covered Persons

■ The "liability" section of CERCLA states:

(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of ... a facility,

(2) any person[3] who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities,

---

**3.** CERCLA defines "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, Unit-

ed States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21).

... or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for— [4]

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a). Thus, current owners, former owners, generators, or transporters, may be held liable if there is a release or threatened release of a hazardous substance from the relevant facility. *See, e.g., State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir.1985).

There is no dispute that Cumberland Farms was at all times relevant to this case the "owner" or "operator" of the Cumberland Farms' Canton facility. The parties have stipulated that the Cumberland Farms' facility, including the truck maintenance building and the various surface and subsurface drainage systems, is a "facility" within the meaning of CERCLA. 42 U.S.C. § 9601(9).[5] *See also United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 184–85 (W.D.Mo.1985) ("facility" includes every conceivable place where hazardous substances come to be located).

Thus, Cumberland Farms, as the owner and operator of the Cumberland Farms' facility, fits into one of the four categories of persons who may be liable under CERCLA.

B. *Release or Threatened Release*

CERCLA states that: "the owner and operator ... of a facility ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable...." 42 U.S.C. § 9607(a).

A "hazardous substance" is defined in CERCLA by reference to its provisions and that of other environmental statutes.[6] The

4. We concur, as have other courts, with the following statement:
The phrase 'from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance' is incorporated in and seems to flow as if it were a part only of subparagraph (4), but it is quite apparent that it also modifies subparagraphs (1)–(3) inclusive. When the Senate's compromise bill was printed in the Congressional Record ... the commencing clause 'from which there is a release' was printed as a new line, supporting the reading we give it above.... The change thus appears to have been simply a printer's error. *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 n. 16 (2d Cir.1985).

5. CERCLA defines "facility" as "(A) any building, structure, installation, equipment, pipe, or pipeline, ... well, pit, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located....." 42 U.S.C. § 9601(9).

6. CERCLA defines a "hazardous substance" as:

(A) any substance designated pursuant to § 1321(b)(2)(A) of Title 33 [the Federal Water Pollution Control Act or Clean Water Act],
(B) any element, compound, mixture, solution or substance designated pursuant to § 9602 of [CERCLA],
(C) any hazardous waste having the characteristics identified under or listed pursuant to § 3001 of the Solid Waste Disposal Act [42 U.S.C. § 9621] ...,
(D) any toxic pollutant listed under § 1317(a) of Title 33,
(E) any hazardous air pollutant listed under § 112 of the Clean Air Act [42 U.S.C. § 7412], and
(F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to § 2606 of Title 15.
42 U.S.C. § 9601(14). *See United States v. Carolawn Co.*, 21 Env't Rep.Cas. (BNA) 2124, 2125 (D.S.C. June 15, 1984) ("By its express terms, [§ 9601(14)] requires only that a substance be designated as hazardous or toxic under *one* of the referenced statutory provisions to be a hazardous substance under CERCLA.").

VOCs that are at issue in this case, trichloroethane, trichloroethylene, dicloroethane, dichloroethylene, and tetrachloroethylene, fall within CERCLA's definition of hazardous substances. *See* 42 U.S.C. § 9602; 40 C.F.R. § 302.1, *et seq.* (designates hazardous substances under CERCLA, 42 U.S.C. § 9602); 40 C.F.R. § 116.4 (designates hazardous substances under the Clean Water Act, 33 U.S.C. § 1321(b)(2)(A)).

### (1) Releases

A "release" is defined by CERCLA as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment...." 42 U.S.C. § 9601(22). The courts have construed CERCLA's definition of "release" broadly. *See, e.g., State of New York v. Shore Realty Corp.*, 759 F.2d at 1045 (2d Cir.1985) ("releases" include leaking tanks and pipelines, the continuing leaching and seepage from earlier spills, and leaking drums); *United States v. Wade*, 577 F.Supp. 1326, 1334 (E.D.Pa.1983) ("releases" include the leaching of hazardous substances into the soil).

### (2) Threatened Releases

CERCLA has created two alternative liability-creating events: the "release" or the "threatened release" of a hazardous substance. *See* 42 U.S.C. § 9607(a)(4) (if "there is a release, *or* a threatened release which causes the incurrence of response costs, of a hazardous substance, [a covered person] shall be liable....") (emphasis added). *While other environmental statutes, e.g.* the Clean Water Act, make parties liable only for actual releases, CERCLA expressly expanded liability to also cover threatened releases.

Threatened releases have been found to include: a defendant's mere ownership of "corroding and deteriorating tanks," a defendant's "lack of expertise in handling hazardous waste," or a defendant's "failure to license the facility." *Shore Realty,* 759 F.2d at 1045. *See also United States v. Medley,* 13 Chem. Waste Lit.Rep. 143, 146 (D.S.C. Nov. 4, 1986) ("The emitting or release of volatile organics into the ambient air and the storage of hazardous substances in deteriorating or leaking drums and unlined lagoons at the Medley Farm site clearly constituted a 'release' or 'substantial threat' of release of hazardous substances into the environment.").

### C. *Liability*

█ The district court ruled, and the defendant argues, that since actual contamination of the plaintiff's property by the defendant's releases of hazardous substances did not occur, the liability requirement has not been met, and therefore the defendant is not liable under CERCLA. The plaintiff argues that the only causation that is required under CERCLA is that defendant's releases or threatened releases cause response costs by the plaintiff; it is not required that the defendant cause actual contamination of plaintiff's property.

### (1) Statutory Language:

CERCLA states: "the owner and operator ... of a facility [or the past owner of a facility, or the generator who transported to a facility, or the transporter to a facility] ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable...." 42 U.S.C. § 9607(a). A literal reading of the statute imposes liability if releases or threatened releases from defendant's facility cause the plaintiff to incur response costs; it does *not* say that liability is imposed only if the defendant causes actual contamination of the plaintiff's property.

### (2) Congressional History:

The Congressional history of CERCLA makes it clear that strict liability was intended for releases or threatened releases which cause response costs. The original House bill imposed liability on "any person who caused or contributed to the release or threatened release." H.R. 7020, 96th Cong.2d Sess. § 3071(a)(1)(C) (1980) 126 Cong.Rec. 26, 779, *reprinted in* 2 A Legislative History of CERCLA, at 39 (1983).

The House Committee Report accompanying the House bill states:

> [T]he usual common law principles of causation, including those of proximate causation, should govern the determination of whether a defendant "caused or contributed" to a release or threatened release.... Thus, for instance, the mere act of generation or transportation of hazardous waste, or the mere existence of a generator's or transporter's waste in a site with respect to which cleanup costs are incurred would not, in and of itself, result in liability.... [F]or liability to attach ..., the plaintiff must demonstrate a causal or contributory nexus between the acts of the defendant and the conditions which necessitated response action....

H.R.Rep. No. 1016, 96th Cong.2d Sess. 33 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News, 6119, 6136–37. But, this causation language was deleted from the final bill that was passed. *See* 126 Cong. Rec. 31, 981–82, *reprinted in* 1 Legislative History of CERCLA at 821–24. Instead, the statute that was passed imposed liability on classes of persons, i.e. owners, former owners, generators, or transporters, *(see § A. Covered Persons, supra )*, without reference to whether they caused or contributed to the release or threat of release. The release or threat of release only need have emanated from the facility which they owned, or to which they transported.

### (3) Case Law

The pertinent case law recognizes that under CERCLA the question is whether the release or the threatened release by a defendant has caused a plaintiff to incur response costs. In *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, defendants had argued that even if there had been releases at defendant's facility, the existence of hydrogeological and other physical factors prevented the releases from contaminating the drinking water. The court stated:

> [The defendant's environmental consultant's] conclusion that there was no threat to drinking supplies was based on the observation that the groundwater flowed toward the harbor. Even assuming [the consultant's] claim to be true, there was nevertheless groundwater contamination. Such a release poses a potential threat ... to local Long Island aquifers....

759 F.2d at 1038, n. 4. *See also Artesian Water,* 659 F.Supp. at 1281–82, *aff'd* 851 F.2d 643 (3d Cir.1988) (neighbors of a site on which hazardous wastes have been deposited may recover response costs incurred as the result of the *threat* that such wastes could migrate into their wells, even though the wells were not yet contaminated); *United States v. Mottolo,* 695 F.Supp. 615, 623 (D.N.H.1988) (In response to defendant's argument that plaintiffs had failed to establish the existence of threatened releases because plaintiffs lacked evidence of off-site pollution, the court held that there was no such requirement in CERCLA).

*Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir. 1988) is particularly apropos to the instant case. In *Artesian,* a water utility company which provided drinking water to the city, sued the owner of a landfill, seeking to recover response costs as a result of a release or threatened release of hazardous substances from the landfill (the Site), which was located 3,000 feet from the well field. Groundwater pollution had been discovered in the vicinity of the well field, but not in the well field itself, and the state had begun an aquifer monitoring program and concluded that the most likely source of the pollution was the landfill Site. There also existed a second waste disposal facility (DS & G), owned by a different entity, which was located several hundred feet from the well field and which defendant asserted was the source of the contamination. Under these facts, which are virtually identical to those in the instant case, the court held that the plaintiff had made a showing of release or threatened release of hazardous substances from the Site sufficient to satisfy its burden on summary judgment. *Id.* at 1281. The court went on to state:

> [M]ost importantly, the policies underlying [CERCLA] conflict with the [defen-

dant's] demand that Artesian prove beyond dispute that the contaminants found near the Site actually flow from the Site. From a technological standpoint, Artesian's ability to "fingerprint" the leachate in the groundwater as emanating from either the Site or the DS & G Landfill is exceedingly doubtful. To impose such a requirement might permit the owners and operators of both facilities to avoid financial responsibility for the cleanup, and would thus eviscerate [CERCLA].

*Id.* at 1282.

To our knowledge, every court that has addressed this issue, with the exception of the district court in the instant case, has held that it is not necessary to prove actual contamination of plaintiff's property by defendant's waste in order to establish liability under CERCLA.[7] There is nothing in the statute, its legislative history, or the

case law, which requires proof that the defendant's hazardous waste actually have migrated to plaintiff's property, causing contamination of plaintiff's property, before CERCLA liability is triggered. Nor is there anything in the statute suggesting that a "two-site" case be treated differently than a one-site case, where the issue is whether a release or threat of release caused "response costs." And we have found no cases making the distinction the district court did.[8]

Since the district court failed to properly consider Dedham's claim that even if Cumberland's releases did not cause the contamination of Dedham's wells, Cumberland's releases and threatened releases caused it to incur response costs, there must be a new trial.

## D. *Defenses*

CERCLA does provide for defenses. 42 U.S.C. § 9607(b) states:

---

**7.** The district court does cite one case, *State of Idaho v. Bunker Hill Co.,* 635 F.Supp. 665 (D. Idaho 1986) to support its finding that CERCLA requires a showing of causation between the defendant's acts and the actual damage to plaintiff's property. The court stated: "[U]nder strict liability the mental state of the defendant is irrelevant, but the damage for which recovery is sought must still be causally linked to the act of the defendant." *Id.* at 674. That case, however, was dealing with liability for a completely different type of harm which is dealt with by a different subsection of CERCLA: damages for injury to natural resources which the government was claiming. CERCLA states that an owner shall be liable for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." 42 U.S.C. § 9607(a)(4)(C) (emphasis added). This is to be contrasted with the section of CERCLA at issue in the instant case, that an owner shall be liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B) (emphasis added). The statutory requirements are clearly distinct. In the former situation, there must be a connection between the defendant and the damages to the natural resources; in the latter situation, there must be a connection between the defendant and the response costs (and no mention is made of any damages at all). We conclude that the *Bunker Hill* case is irrelevant to the causation requirements in the instant case.

**8.** The district court does cite to three cases in its "two-site" discussion, but they hardly lend sup-

port to the district court's conclusion. The district court states: "As the court explained in *Artesian Water* ... a two-site case in which a water company sought to recover the costs of response to groundwater pollution in its well field:

> CERCLA's strict liability scheme does not diminish the necessity of demonstrating a causal connection between a release or threatened release and the incurrence of costs by a [§ 9607] plaintiff.... [Plaintiff] must therefore show that it incurred costs as a result of the release or threatened release of hazardous substances from the [defendant's] Site.

659 F.Supp. at 1282." This quotation, however, offers no support for the district court's conclusion that there must be a causal nexus between the defendant's conduct and the *contamination* of the plaintiff's property. Rather, the *Artesian Water* court explicitly states that there must be a causal connection between the defendant's conduct and the plaintiff's *incurrence of costs.* Thus, the district court's holding that in two-site cases the plaintiff must prove that the defendant's releases physically migrated to the plaintiff's site, is not supported by the *Artesian Water* case. The district court's reliance on *Shore Realty,* 759 F.2d at 1044 n. 17, is equally misplaced. Indeed, *Shore Realty* repeats over and over again, that a showing of causation [of actual contamination] is *not* required under CERCLA. Also, the district court's invocation of *Bunker Hill,* 635 F.Supp. at 674, is not relevant to the instant case for the reasons discussed *supra* in footnote 7.

## (b) Defenses

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against forseeable acts or omissions of any such third party and the consequences that could forseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

Defenses (1) and (2) obviously do not apply and under the stipulated and uncontested facts the viability of defense (3) seems dubious. The determination of the application of defenses is, however, a matter for the district court in the first instance.

E. *Response Costs*

Under CERCLA, if the release or threatened release of a hazardous substance "causes the incurrence of response costs," 42 U.S.C. § 9607(a)(4), a covered person shall be liable for the "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B).

CERCLA states that the promulgation of a revised national contingency plan (NCP) "shall include a section ... to be known as the national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants...." 42 U.S.C. § 9605. The NCP, 40 C.F.R. § 300.1 *et seq.*, prepared by the Environmental Protection Agency, states:

(a)(1) Any person may undertake a response action to reduce or eliminate the release or threat of release of hazardous substances.... [Section 9607] of CERCLA authorizes persons to recover certain response costs consistent with this Plan from responsible parties.

(2) For purposes of cost recovery ... a response action will be consistent with the NCP ... if the person taking the response action:

(i) Where the action is a removal action, acts in circumstances warranting removal and implements removal action consistent with § 300.65.

(ii) Where the action is a remedial action: (A) Provides for appropriate site investigation and analysis of remedial alternatives as required under § 300.68; (B) Complies with the provisions of paragraphs (e) through (i) of § 300.68; (C) Selects a cost-effective response; and (D) Provides an opportunity for appropriate public comment concerning the selection of a remedial action....

(3) For the purpose of consistency with §§ 300.65 and 300.68, ... any action to be taken by the "lead agency" in § 300.65 or § 300.68 may be taken by the person carrying out the response....

40 C.F.R. § 300.71.

CERCLA defines "response" as "remove, removal, remedy, and remedial action...." 42 U.S.C. § 9601(25). "Remove" or "removal" means:

[T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of haz-

ardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or a threat of release. The term includes ... provision of alternative water supplies....

42 U.S.C. § 9601(23). "Remedy" or "remedial action" is defined as:

[T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes ... perimeter protection using dikes, trenches, or ditches, ... neutralization, ... collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the health and welfare and the environment....

42 U.S.C. § 9601(24).

Dedham Water asserts that it incurred $19 million in response costs, including the testing and monitoring of the White Lodge Well Field and surrounding areas, and the construction and operation of a water treatment facility. If, on remand, the district

court finds that Cumberland Farms was responsible for the response costs incurred, it must determine the amounts of such costs as come within the statutory framework: § 9607(a)(4)(B) (costs consistent with the national contingency plan); and § 9601(23)(24) and (25).

## OTHER STATUTES

The district court found that Cumberland Farms was not liable under the other statutes that plaintiff invoked on the same liability theory it applied to the CERCLA claim.

A. *Massachusetts Oil and Hazardous Material Release Prevention and Response Act*

■ The Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass.Gen.L. ch. 21E, § 4–5 is patterned after the federal CERCLA statute.[9] *See Sheehy v. Lipton Industries, Inc.,* 24 Mass.App.Ct. 188, 507 N.E.2d 781, 786 (1987), *review denied,* 400 Mass. 1103, 509 N.E.2d 1202 (1987). Chapter 21E entitles a person to reimbursement for damage to his real or personal property and for reasonable costs of assessment, containment, and removal, from owners or operators of a site from which there has been a release or threat of release of hazardous materials.

For the same reasons discussed in the CERCLA section *supra,* we conclude that the plaintiff does not need to prove that

---

9. Chapter 21E, § 4 states in relevant part:

   Nothing in this section shall preclude assessment, containment and removal by any person threatened or damaged by such release or threat of release, provided such assessment, containment and removal is conducted in accordance with the Massachusetts contingency plan....

   Any person who undertakes assessment, containment or removal action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such assessment, containment and removal....

   Chapter 21E, § 5(a) states in relevant part:

   Except as otherwise provided in this section, (1) the owner or operator of ... a site

from or at which there is or has been a *release or threat of release* of oil or hazardous material; (2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material; ... [and] (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable, without regard to fault, ... (iii) to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release. Except as provided in paragraph (b), such liability shall be joint and several.

actual releases of hazardous waste from defendant's property physically migrated and contaminated the plaintiff's property. Chapter 21E requires only that the release or threatened release of a hazardous substance from the defendant's property caused the plaintiff to incur reasonable response costs. There must, therefore, be a new trial as to liability and damages under this statute.

## B. *The Clean Water Act*

■ The CWA (as amended February 4, 1987) provides that a violation "with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection … shall not be the subject of a civil penalty action under … § 1365 of this title [the CWA citizen suit provision.]" 33 U.S.C. § 1319(g)(6)(A)(ii). The institution, prosecution and settlement of the action brought by DEQE against Cumberland Farms is a bar to the CWA action by Dedham Water.

## C. *Resource Conservation and Recovery Act*

■ RCRA has a similar provision to that of the CWA barring a private suit, "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order." 42 U.S.C. § 6972(b)(1)(B). The DEQE action, therefore, bars this claim under RCRA.

## D. *Attorney's Fees*

■ Dedham Water has asked for attorney's fees under the Clean Water Act, RCRA and Mass.Gen.L. ch. 21E.

Mass.Gen.L. ch. 21E, § 15 provides:

§ 15. Citizen enforcement

Citizen enforcement.

In any suit by Massachusetts residents to enforce the requirement of this chapter, or to abate a hazard related to oil or hazardous materials in the environment, the court may award costs, including reasonable attorney and expert witness fees, to any party other than the commonwealth who advances the purposes of this chapter.

On remand, therefore, if the district court finds that Dedham Water is entitled to response costs under Mass.Gen.L. ch. 21E it may award costs and attorney's fees to Dedham Water.

Vacate the judgment of the district court and Remand for further proceedings consistent herewith.

Costs awarded to Dedham Water.

## MEMORANDUM AND ORDER

Contrary to the defendant, Cumberland Farms' assertion, the panel did not overlook the undisputed evidence. This was an action brought under CERCLA, which provides that if there has been a "release or threatened release" from defendant's facility, 42 U.S.C. §§ 9607(a)(4), 9601(14) & (22), which caused a plaintiff to incur "response costs," *id.* § 9607(a)(4), the plaintiff may recover those costs provided they are necessary and "consistent with the national contingency plan," *id.* §§ 9607(a)(4)(B), 9601(23)–(25). The district court in this case held that the defendant's "releases" did not, in fact, contaminate the plaintiff's wells. *Dedham Water Co. v. Cumberland Farms, Inc.*, 689 F.Supp. 1223, 1235 (D.Mass.1988). But, the district court did not consider the additional question of whether defendant's releases (or threatened releases) might nonetheless have caused the plaintiff to incur "response costs" even though those releases did not *in fact* contaminate the wells. (A plaintiff, for example, under certain circumstances might reasonably think that a particular release would prove likely to contaminate his wells and reasonably spend money to avoid the contamination even though no actual contamination occurs.) Because the case was brought under CERCLA, we remanded the case so that the district court could make findings relevant to this CERCLA claim.

The defendant now petitions for rehearing. It says that the "undisputed evidence" reveals that, under the circumstances here present, it could not have happened

that its "releases" (or "threatened releases") (a) did not in fact contaminate the wells, but (b) nonetheless caused the plaintiff to incur response costs. Having read the record, however, we did not find the evidence so perfectly clear on this point that we were prepared to make the relevant factual findings ourselves; rather, we remanded the case so that the district court could hear argument and then do so.

The defendant goes on to say that the parties stipulated that the plaintiff incurred response costs because of "actual" contamination of its well field. The stipulation to which defendant refers says:

> The plaintiffs have incurred costs in order to "respond" to, and "in response" to, the contamination of the White Lodge Well Field as those terms are defined in CERCLA § 101(24), 42 U.S.C. § 9601(25).

We are not persuaded at this stage of the proceedings, however, that we can interpret this stipulation definitively as disposing of the issue, particularly when the district court, in its opinion, nowhere suggested that a stipulation lay behind its failure to make findings on other than the "actual contamination" question. We therefore think it appropriate to leave the meaning of the stipulation to the district court on remand.

We also note that liability in respect to costs caused by releases (or threatened releases) that do not in fact contaminate wells exists only where the statutory requirements are met; and the relevant standards are objective. *See* 42 U.S.C. § 9607(a). Obviously, a New Jersey well owner who began to make local-area contamination studies because of releases occurring in California could not claim, objectively speaking, that the California releases "cause[d]" the costs, *see id.* § 9607(a)(4), or that his expenditures were "necessary" and "consistent with the national contingency plan," *id.* § 9607(a)(4)(B). Equally obvious, there can be circumstances where a defendant causes "costs" but does not cause *actual* contamination. Indeed, how else could a "threatened release" ever cause a "response cost?"

As we have said, on remand the district court should decide this as-yet-undecided CERCLA issue. In doing so, it is free to consider, and to take appropriate account of, the stipulation to which defendant refers.

The petition for rehearing is *denied.*