UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1123

DANIEL LENN, ETC., ET AL.,

Plaintiffs, Appellants,

v.

PORTLAND SCHOOL COMMITTEE, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U. S. District Judge]

Before

Torruella, Selya and Boudin, Circuit Judges.

Richard L. O'Meara, with whom Murray, Plumb & Murray was on

brief, for appellants.
Eric R. Herlan, with whom Peter H. Stewart, Assistant

Attorney General, and Drummond Woodsum Plimpton & MacMahon were

on consolidated brief, for appellees.

July 15, 1993

SELYA, Circuit Judge. This appeal features a
SELYA, Circuit Judge.

controversy between the parents of a handicapped child and a

local school committee. Despite the parents' protests, a state

hearing officer declared the school committee's 1991-92

individualized education program (IEP) appropriate for the

child's needs and in compliance with federal law. The United

States District Court for the District of Maine upheld the

finding. We affirm.

I. BACKGROUND

Daniel Lenn, a minor, is handicapped within the meaning

of the Individuals with Disabilities Education Act (IDEA), 20

U.S.C. 1400-1485 (1988 & Supp. III 1991).1 Daniel has a

severe, non-verbal learning disability connected with the brain's

right hemisphere. While his verbal IQ test scores are average to

low average, Daniel has difficulty interpreting non-verbal

messages, such as facial cues. He has a short attention span,

lacks the ability to intake, process, or retrieve information in

an organized way, possesses poor visual memory, often

misperceives the world around him, and pays excessive attention

to small details. His disability inhibits social interaction

with peers and impedes academic progress.

Daniel attended the Portland, Maine public schools as a

1In their complaint, the plaintiffs also invoke section 504
of the Rehabilitation Act, 29 U.S.C. 794 (1988). Concluding
that the sweep of the two statutes is identical for purposes of
this case, the parties have briefed and argued their points
solely with reference to the IDEA. We assume arguendo that the

parties' assessment is accurate. Hence, we analyze the assigned
errors under the IDEA.

2

special education student through the eighth grade. While he

advanced from year to year, his attainments fell steadily behind

those of his peers. His progress slowed to a crawl during the

1989-90 and 1990-91 school years. By July 1991, Daniel had

completed the eighth grade; nevertheless, his reading and

mathematical calculation scores were at roughly a sixth-grade

level and his score in applied mathematics was at a second-grade

level.

Daniel's eighth-grade year (1990-91) was interrupted by

a one-month midwinter hospital stay, during which treating

professionals illuminated the nature and extent of his cognitive

disability. That July, Daniel's parents placed him in a summer

program at Eagle Hill, a private school in Massachusetts. They

also contacted the Cleveland Clinic and arranged to have Daniel

undergo a series of additional educational, neurological, and

psychological examinations. Relying in part on the new

information generated through the Lenns' efforts, the Portland

School Committee (Portland) shifted gears, scrapped several of

its earlier (unsuccessful) approaches, and proposed an IEP for

Daniel's ninth-grade education that contained several

innovations. Nevertheless, Daniel's parents rejected the public-

school-based program, unilaterally enrolled Daniel as a full-time

residential student at Eagle Hill,2 and requested a hearing on

the IEP's adequacy.

2Daniel is still in residence at Eagle Hill, albeit at
considerable expense to the Lenns.

3

After pondering testimony from eighteen witnesses and

reviewing numerous exhibits, the state hearing officer concluded

that Portland's IEP for the 1991-92 school year was "reasonably

calculated to be of significant educational benefit in an

environment which is much less restrictive than Eagle Hill."

Accordingly, he rejected the Lenns' remonstrance. The federal

district court upheld the agency determination. This appeal

ensued.3

II. STATUTORY OVERVIEW

We start our substantive discussion by parsing the

statutory scheme and describing how, and to what extent, parents

or guardians displeased by a school board's response to a child's

handicap may seek judicial review of an IEP.

A

To qualify for federal funding under the IDEA, a state

must offer "all children with disabilities . . . a free

appropriate public education." 20 U.S.C. 1400(c), 1412(1).

In this context, appropriateness requires that the instructional

plan be custom tailored to address the handicapped child's

"unique needs," 20 U.S.C. 1400(c), in a way "reasonably

calculated to enable the child to receive educational benefits."

Board of Educ. v. Rowley, 458 U.S. 176, 207 (1982); accord Amann

3Daniel Lenn and his parents, Stephen and Eileen Lenn,
plaintiffs below, are appellants in this court. Portland and the
Maine Department of Education, defendants below, appear as
appellees. In view of the community of interest between the
school committee and the state agency, we treat the appeal as if
Portland were the sole appellee.

4

v. Stow Sch. Sys., 982 F.2d 644, 647 (1st Cir. 1992); Roland M.

v. Concord Sch. Comm., 910 F.2d 983, 987 (1st Cir. 1990), cert.

denied, 111 S. Ct. 1122 (1991). Because the IEP a written

document detailing the student's current educational level, the

short-term and long-term goals of the educational plan, the

specific services to be offered (including transition services),

and a set of objective criteria for subsequent evaluation, see 20

U.S.C. 1401(20); 34 C.F.R. 300.346 (1992) comprises the

centerpiece of a state's IDEA-compelled response to a particular

child's handicap, the critical inquiry in a case of this genre is

"whether a proposed IEP is adequate and appropriate for a

particular child at a given point in time." Burlington v.

Department of Educ., 736 F.2d 773, 788 (1st Cir. 1984), aff'd,

471 U.S. 359 (1985).

The IDEA does not promise perfect solutions to the

vexing problems posed by the existence of learning disabilities

in children and adolescents. The Act sets more modest goals: it

emphasizes an appropriate, rather than an ideal, education; it

requires an adequate, rather than an optimal, IEP.

Appropriateness and adequacy are terms of moderation. It follows

that, although an IEP must afford some educational benefit to the

handicapped child, the benefit conferred need not reach the

highest attainable level or even the level needed to maximize the

child's potential. See Rowley, 458 U.S. at 198; Roland M., 910

F.2d at 992.

The IDEA also articulates a preference for

5

mainstreaming. See 20 U.S.C. 1412(5) (requiring states to

educate handicapped and non-handicapped children together "to the

maximum extent appropriate"). Translated into practical

application, this preference signifies that a student "who would

make educational progress in a day program" is not entitled to a

residential placement even if the latter "would more nearly

enable the child to reach his or her full potential." Abrahamson

v. Hershman, 701 F.2d 223, 227 (1st Cir. 1983); accord Hampton

Sch. Dist. v. Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992). And,

moreover, when the bias in favor of mainstreaming is married to

the concepts of appropriateness and adequacy, it becomes apparent

that an IEP which places a pupil in a regular public school

program will ordinarily pass academic muster as long as it is

"reasonably calculated to enable the child to achieve passing

marks and advance from grade to grade." Rowley, 458 U.S. at 204.

B

A parent or guardian may challenge an IEP's adequacy by

demanding a due process hearing before the state educational

agency. See 20 U.S.C. 1415(b)(2), 1415(c). If the agency

approves the IEP, the parent or guardian may seek further review

in either state or federal court. See id. at 1415(e)(2). The

relevant statutory provision requires the forum court to mull the

administrative record, take additional evidence under certain

circumstances, and "base[] its decision on the preponderance of

the evidence." Id. While the IDEA envisions judicial review,

the statute "is by no means an invitation to the courts to

6

substitute their own notions of sound educational policy for

those of the school authorities which they review." Rowley, 458

U.S. at 206. Rather, the law contemplates an intermediate

standard of review on the trial-court level a standard which,

because it is characterized by independence of judgment, requires

a more critical appraisal of the agency determination than clear-

error review entails, but which, nevertheless, falls well short

of complete de novo review. See Roland M., 910 F.2d at 989;

Colin K. v. Schmidt, 715 F.2d 1, 5 (1st Cir. 1983).

In the course of this independent review, the

administrative proceedings must be accorded "due weight."

Rowley, 458 U.S. at 206; see also Colin K., 715 F.2d at 5.

Although the exact quantum of weight is subject to the district

judge's exercise of informed discretion, see Hampton, 976 F.2d at

52; G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 946 (1st Cir.

1991), the judge is not at liberty either to turn a blind eye to

administrative findings or to discard them without sound reason.

See Burlington, 736 F.2d at 792 ("The court, in recognition of

the expertise of the administrative agency, must consider the

findings carefully and endeavor to respond to the hearing

officer's resolution of each material issue."). In the end, the

judicial function at the trial-court level is "one of involved

oversight," Roland M., 910 F.2d at 989; and in the course of that

oversight, the persuasiveness of a particular administrative

finding, or the lack thereof, is likely to tell the tale.

C

7

Determining the adequacy of an IEP is a fact-intensive

exercise. Consistent with this verity, the governing standard

for appellate review in an IDEA case is firmly settled:

[I]n the absence of a mistake of law, the
court of appeals should accept a district
court's resolution of questions anent
adequacy and appropriateness of an IEP so
long as the court's conclusions are not
clearly erroneous on the record as a whole.

Id. at 990-91. The clear-error hurdle is, of course, quite high.

See, e.g., Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148,

152 (1st Cir. 1990) (holding that, under a regime of clear-error

review, an appellate court "ought not to upset findings of fact

or conclusions drawn therefrom unless, on the whole of the

record, [the appellate judges] form a strong, unyielding belief

that a mistake has been made"). Even in precincts where the

clearly erroneous standard obtains, however, a trial court's

rulings of law are reviewed de novo. See LeBlanc v. B.G.T.

Corp., 992 F.2d 394, 396 (1st Cir. 1993); Dedham Water Co. v.

Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st Cir. 1992).

III. CLAIMED ERRORS OF LAW

In an effort to sidestep clear-error review and take

shelter in the lee of a more accommodating standard, the Lenns

attribute two errors of law to the court below. They contend

that the court (1) applied the wrong legal yardstick in taking

the measure of the hearing officer's findings; and (2) failed

sufficiently to address each of Daniel's identified educational

needs in determining the adequacy of Portland's proposed IEP. We

discuss these contentions seriatim.

8

A

Appellants' flagship claim is that the lower court

affirmed the hearing officer's decision without conducting the

independent evidentiary review that the IDEA requires. The claim

founders: the record below contains all the earmarks of a

suitably deferential, yet suitably independent, judicial inquiry.

The linchpin of this conclusion is the district court's

opinion. In it, Judge Brody explains a reviewing court's duty,

canvasses the pertinent authorities, and acknowledges the

relationship between the hearing officer's findings and the

district court's oversight function, concluding that "while [the

district] court must make an independent ruling, [its] review

must be something short of de novo." Lenn v. Portland Sch.

Comm., No. 92-0011-P-H, slip op. at 6 (D. Me. Dec. 14, 1992) (D.

Ct. Op.). The court's discussion could hardly be more pointed or

more accurate.

In the face of this pellucid prose, appellants have an

uphill battle. They argue that, although the district judge gave

lip service to the correct standard, he actually viewed the

evidence through a much more deferential glass. We recognize

that actions sometimes speak louder than words. Thus, a trial

court cannot satisfy its oversight obligation in an IDEA case by

reciting the catechism of independent review and then failing to

practice what it preaches. But when, as now, a trial court

delineates the proper rule of decision, citing book and verse,

the burden of demonstrating that the court is merely mouthing

9

empty platitudes rests with the party who mounts the accusation.

This is a heavy burden; it cannot be carried by perfervid

rhetoric or glib wordplay. To prevail on such a theory, the

accuser must offer solid indications that the district court in

fact strayed from the straight and narrow. After all, an

appellate tribunal ought not lightly assume that a federal trial

judge is indulging in the adjudicatory equivalent of a shell

game.

In this instance, we think the accusation that the

judge said one thing, but did another, is unfounded. The Lenns'

most touted point is their asseveration that the district court

expressly invoked the clear-error standard when it noted that a

court is "not confined to the hearing officer's decision if [it]

find[s] clear error." D. Ct. Op. at 10. Based primarily on this

remark,4 appellants invite us to disregard the court's professed

allegiance to the correct standard of review. We decline the

invitation.

First and foremost, we simply cannot credit appellants'

argument that this isolated reference indicates a wholesale

4The district court also wrote that it found "ample evidence
in the record" to support the hearing officer's decision. D. Ct.
Op. at 10. Appellants argue that this statement manifests an
abandonment of the preponderance-of-the-evidence test. This
argument proves nothing more than appellants' penchant for
grasping at straws especially since the context makes clear
that the lower court applied the proper test; indeed, in the very
same paragraph of its opinion, the court used the phrase
"preponderance of the evidence." Id. We will neither confine

district courts to the rote recitation of buzzwords nor penalize
them for relieving the tedium of opinion writing by the
occasional employment of artful synonyms.

10

abandonment of the principles of independent review. We think it

is far more likely, all things considered, that the reference to

"clear error" represents simply an infelicitous choice of phrase.

Indeed, a close perusal of the record makes manifest the depth of

judicial involvement and provides clinching evidence that the

district judge utilized the approved level of review. The

transcript reveals that the judge took a hands-on approach to the

decisional process. Instead of limiting his perscrutation to the

administrative record, he conducted what amounted to a mini-

trial, hearing testimony from two witnesses regarding Daniel's

educational needs and receiving newly emergent documentation

chronicling Daniel's progress at Eagle Hill. The judge then

carefully scrutinized all the evidence, new and old, and drew his

own conclusions from it. This is the very stuff from which

independent review is fashioned.

We have said enough. The law does not require district

courts to be precise to the point of pedantry. Consequently, an

appellate court must not hesitate to excuse an awkward locution

and give a busy trial judge a bit of breathing room. If using

the wrong word or phrase constituted grounds for reversal in

every case, much too high a premium would be placed on sheer

literalism. We have regularly refused to exact that premium.

See, e.g., Roland M., 910 F.2d at 991 n.4 (disregarding district

court's "infelicitous" choice of terminology where "the context,

and other statements in the court's memorandum" made plain that

the court fully understood the operative legal principle);

11

Collins v. Marina-Martinez, 894 F.2d 474, 477 n.4 (1st Cir. 1990)

(similar); Desfosses v. Wallace Energy, Inc., 836 F.2d 22, 30

(1st Cir. 1987) (similar); United States v. Kobrosky, 711 F.2d

449, 456 (1st Cir. 1983) (similar); see also Clauson v. Smith,

823 F.2d 660, 663 n.3 (1st Cir. 1987) ("We have held before, and

today reaffirm, that if `[a] reading of the colloquy and decision

as a whole . . . indicates that, despite some loose use of

language, the proper . . . standard was applied,' we will not

reverse on the basis of what amounts to a lapsus linguae.")

(citation omitted); cf. Hampton, 976 F.2d at 54 (rejecting, on a

burden of proof issue, appellants' "contention that the district

court actually did something other than that which it said it was

doing"). So here. Mindful that pettifoggery, for its own sake,

benefits no one, we will not disregard the totality of the

circumstances in a headlong rush to elevate formalism over

substance.

We add, moreover, that even if Judge Brody used the

challenged terminology in a purposeful manner, we would not

reverse. The "clear error" reference appears in a paragraph in

which, after restating the hearing officer's key findings that

the 1991-92 IEP offered Daniel a major change in services and

that the new mix was reasonably calculated to bestow a

significant educational benefit on him the judge acknowledged

his duty to afford the administrative proceeding due weight.5 A

5The court wrote: "While we are not confined to the hearing
officer's decision if we find clear error, we are constrained in
that we cannot impose our view of preferable educational methods

12

reference at this juncture to clear error is not inappropriate

since the precise degree of deference attributable to a hearing

officer's subsidiary findings of fact in an IDEA case ultimately

rests within the trial court's discretion. See, e.g., Hampton,

976 F.2d at 52; Westmoreland, 930 F.2d at 946; Burlington, 736

F.2d at 792. That the district court may have afforded

particular administrative findings substantial respect even

deference on a par with clearly erroneous review would not

comprise reversible error so long as the court made an

independent ruling as to the IEP's adequacy based on a

preponderance of all the evidence, including the hearing

officer's duly weighted findings.

This criterion was satisfied. The opinion as a whole

shows conclusively that the judge made an independent

determination concerning the adequacy of Portland's IEP, throwing

all the available evidence into the pot. Among other things,

Judge Brody specifically discussed the testimony of Daniel's

teachers in Portland, the testimony of the Cleveland Clinic's

independent evaluators, and Daniel's standardized test scores.

D. Ct. Op. at 11. He also cited additional record evidence that

buttressed the hearing officer's evaluation of Daniel's past

progress in the Portland public schools and the likelihood of

future educational benefits should the 1991-92 IEP be

implemented. Id. at 10. Last, but surely not least, the judge

applied the proper burden of proof, concluding that the Lenns had

upon the state." D. Ct. Op. at 10.

13

not "proven [theircase] by a preponderance ofthe evidence." Id.6

It strains credulity to assume, in these circumstances,

that the district court's lonely reference to "clear error"

heralds an intention to disregard a standard of review explicitly

described in the court's opinion and indelibly etched upon its

pages. Hence, we find no warping of the standard of review. We

hasten to add, however, that even if the controversial phrase

represents more than a slip of the district court's pen a

supposition that we deem unsubstantiated the reference, by

itself, does not call into question the court's proper

performance of its oversight function.

B

Appellants next assert that the district court must

"determine separately for each area of identified educational

need . . . whether, by a preponderance of the evidence, [an IEP]

addresses that need" sufficiently. Appellants' Reply Brief at

11. Building on this premise, appellants then conclude that the

court below emasculated the requirement by failing to consider

6While the Lenns grudgingly acknowledge this reference, they
maintain that the court erred by requiring them to prove that
only Eagle Hill will provide Daniel with an appropriate education

when, in fact, their burden was merely to prove the
inappropriateness of Portland's IEP. On balance, we do not
believe it can fairly be said that the court misapprehended the
contours of the issue. Throughout its pages, the district
court's opinion is geared toward determining whether "the
proposed IEP was reasonably calculated to enable Daniel to
receive educational benefits." D. Ct. Op. at 10. Indeed, the
court pointedly wrote that "[a]lthough the Eagle Hill residential
program may well be the ideal educational environment for Daniel,
that is not the legal standard under [the] IDEA." Id.

This specific disclaimer sounds the death knell for appellants'
argument.

14

"separately" and "directly" whether Portland's IEP addressed

Daniel's non-academic needs in a meaningfully beneficial way. We

disagree with both the premise and the conclusion.

Admittedly, an IEP is designed as a package. It must

target "all of a child's special needs," Burlington, 736 F.2d at

788 (emphasis supplied), whether they be academic, physical,

emotional, or social. See Roland M., 910 F.2d at 992 (explaining

that "purely academic progress . . . is not the only indici[um]

of educational benefit"); Timothy W. v. Rochester, N.H. Sch.

Dist., 875 F.2d 954, 970 (1st Cir.) (observing that "education"

under the Act is broadly defined), cert. denied, 493 U.S. 983

(1989); U.S. Dep't of Educ., Notice of Policy Guidance, 57 Fed.

Reg. 49,274 at 49,275 (1992) (stating that an IEP must address

"the full range of the child's needs"). Because a one-

dimensional view of an IEP would afford too narrow a foundation

for a determination that the program is reasonably calculated to

provide "effective results" and "demonstrable improvement" in the

various "educational and personal skills identified as special

needs," Burlington, 736 F.2d at 788, a district court's

determination that an IEP complies with the Act necessarily

involves a host of subsidiary determinations.

Be that as it may, appellants' legal formulation

distorts the Act's requirements. The Act does not mandate, nor

has any court held it to require, that the district judge must

consider each unique need in isolation and make a separate

finding regarding the preponderance of the evidence in each and

15

every identified area. Such a requirement would serve merely to

balkanize the concept of educational benefit and to burden the

district courts without producing any offsetting advantages. We

hold that no such requirement exists. In the last analysis, what

matters is not whether the district judge makes a series of

segregable findings, but whether the judge is cognizant of all

the child's special needs and considers the IEP's offerings as a

unitary whole, taking those special needs into proper account.

The record also belies appellants' self-serving

suggestion that the district court assessed Daniel's academic

needs in a vacuum. A trial court charged with evaluating the

adequacy of an IEP cannot be said to have committed legal error

as long as (1) it does not overlook or misconstrue evidence of

record, and (2) its overall decision is based upon a supportable

finding that the program described in the IEP is reasonably

calculated to address the handicapped child's education-related

needs, both academic and non-academic. The district court's

finding in this case fits comfortably within that rubric. We

explain briefly.

The district court explicitly acknowledged "Daniel's

self-esteem and social skills needs" and took pains to limn the

"wide range of after-school support services" proposed by

Portland to address those needs. D. Ct. Op. at 8. In

considering the likely impact of these services, the court

focused on Portland's plan to provide a social skills facilitator

and opined that, although hiring a facilitator might not be the

16

best mechanism for addressing Daniel's needs, "the ideal" is not

"the legal standard under [the] IDEA." Id. at 10; see also id.

at 12. The court observed that Portland's program would "enable

Daniel to remain in his home community and interact daily with

non-disabled peers," id. at 10, thus furthering his social

development.7 Finally, the judge mentioned that while "the

goals for Daniel's social and organizational skill development

would be more useful if they could be objectively measured," id.

at 11 n.2, this deficiency does not undermine the IEP.

Based on these, and other comments, it is clear beyond

hope of contradiction that Portland's ability to address Daniel's

non-academic needs informed the district court's overall

determination that the IEP comports with the Act's requirements.

No more is exigible.

IV. WEIGHT OF THE EVIDENCE

Appellants' final assignment of error posits that the

district court blundered in concluding that Portland's IEP would

7We do not accept appellants' hypothesis that the mainstream
nature of a proposed placement can never enter into the primary
analysis of an IEP's adequacy. When a child, like Daniel,
demonstrates a particular need for learning how to interact with
non-disabled peers, a mainstream placement will almost inevitably
help to address that need. Such an integral aspect of an IEP
package cannot be ignored when judging the program's overall
adequacy and appropriateness. The Third Circuit, which recently
reaffirmed the special nature of the educational benefits that
mainstream programs confer, apparently shares this view. See

Oberti v. Board of Educ., F.2d , (3d Cir. 1993) [1993

WL 178480, *9] (observing that, in assessing the educational
benefit of placing a handicapped child with non-handicapped
peers, "the court must pay special attention to those unique
benefits the child may obtain from integration in a regular
classroom . . ., i.e., the development of social and

communication skills from interaction with nondisabled peers").

17

provide Daniel with an appropriate public education. We discern

no clear error. To the contrary, the record fully sustains a

finding that Portland's IEP is adequate and appropriate to ensure

the requisite degree of educational benefit.

On this score, appellants' cardinal contention is that

Portland's IEP fails to take account of Daniel's inadequate

social skills. We demur. The record reflects that the IEP

forthrightly addresses this area of critical need, offering

Daniel an array of after-school socialization services. For

example, Daniel would spend three hours a day, three days a week,

with a social skills facilitator, who would encourage and oversee

his involvement in extracurricular and community-based

activities. The facilitator would work to hone Daniel's skills

in relating to non-disabled peers in a real-world milieu.8 On

the remaining school days, Daniel would receive social skills

programming in more structured environments, spending one

afternoon at a one-on-one counseling session with a doctorate-

level psychologist and the other in the company of handicapped

peers at a group counseling session devoted to self-esteem

8To be sure, there is room for principled disagreement about
the efficacy of a social skills facilitator. Portland's
witnesses and plaintiffs' experts expressed widely divergent
views on this topic. But, judges are not especially well-
equipped to choose between various educational methodologies.
See Rowley, 458 U.S. at 207-08. Where, as here, there is

satisfactory record support for the appropriateness of the
particular approach selected by the school department and
approved by the state education agency, a reviewing court should
not meddle. See id.; see also Roland M., 910 F.2d at 992

(warning that "courts should be loathe to intrude very far into
interstitial details or to become embroiled in captious disputes
as to the precise efficacy of different instructional programs").

18

issues. Thus, while Portland's IEP may not contain the precise

programs that the parents prefer, it embodies a substantial,

suitably diverse socialization component.

On the academic side, the IEP places Daniel in a small,

special education class for English (with a student/teacher ratio

of eight-to-three) and four mainstream educational courses

(ranging in size from fifteen to eighteen students per class).

In the mainstream classes (at least three of which would be

taught or co-taught by a special educator), Daniel would study

Western civilization, mathematics,9 science, and an elective.

The special English class would occupy the first period of every

day and would prepare Daniel organizationally for the remainder

of the day. A small group session held during the last period

would help Daniel synthesize the day's lessons, hone his

organizational skills, and teach him homework strategies.

Portland also offered (1) personalized instruction in custom-

tailored learning techniques, on a daily basis, to assist Daniel

in mastering the curriculum; and (2) a home/school coordinator to

work once a week with Daniel's mother to synthesize home and

institutional instruction.

Under federal law, Portland's IEP package must assure

Daniel a "basic floor of [educational] opportunity." Rowley, 458

U.S. at 201 (internal quotation marks omitted). The finding that

9The mainstream math class contemplates individual
instruction geared to each student's level and needs an
especially important feature given the nature of Daniel's
handicap and the problems he has encountered in dealing with
applied mathematics.

19

Portland's proposal at least reaches this floor cannot be

faulted. The school committee tendered a rigorous program, to be

administered by a highly experienced and well-credentialed team,

catering to the full range of Daniel's needs through a variety of

mechanisms.10 The academic schedule, with its mix of

mainstream courses, small-class instruction, and private

programming in compensatory skills, furnished abundant reason for

the hearing officer and the court below to find that the IEP

would likely achieve measured success.11 The IEP's non-

academic component which includes numerous one-on-one and

small-group services geared toward fostering self-esteem,

enhancing socialization skills, developing organizational

abilities, and perfecting homework techniques furnishes a

satisfactory predicate for a similar finding in respect to non-

academic needs.

In short, Portland's IEP provides "personalized

instruction with sufficient support services to permit [Daniel]

to benefit educationally from that instruction." Rowley, 458

U.S. at 203. What is more, it allows Daniel to live at home with

10Appellants criticize the IEP for offering no services
geared toward physical education or health management needs. In
fact, the IEP affords Daniel an individualized physical education
program as well as a choice of extracurricular athletic
activities. Since the record fails to demonstrate that Daniel
suffers an infirmity in motor coordination or personal hygiene
that would require specially designed programs, no more is
required.

11Significantly, teachers who had previously taught Daniel
in large, mainstream classes testified that he participated in
class activities, did well, felt good about his work, and
achieved passing grades.

20

supportive parents, to be educated with non-disabled peers, and

to interact regularly with the members of his community.12 It

follows inexorably that the district court's findings of

appropriateness and adequacy comfortably survive clear-error

review.

V. CONCLUSION

We need go no further.13 The trial court correctly

discerned the relevant legal principles and applied them to the

task at hand. Its conclusion that Portland's proposed 1991-92

IEP meets Daniel's needs is supported by the record. Finding no

significant error of law or fact, we affirm the judgment below.

Affirmed.

12This mainstream approach, which places Daniel in "the
least restrictive environment" appropriate to his needs, 34
C.F.R. 300.552(d) (1992), is the preferred choice under the
Act. See 20 U.S.C. 1412(5); see also Rowley, 458 U.S. at 202.

13Appellants' brief is larded with claims that a
fundamentally flawed process created substantive infirmities in
Portland's IEP. However, in the district court, appellants
stipulated to the absence of any disputed procedural issues.
Because these procedural claims have not been properly preserved,
they need not be addressed in this venue. See United States v.

Slade, 980 F.2d 27, 31 (1st Cir. 1992) (discussing raise-or-waive

rule); Hampton, 976 F.2d at 53-54 (refusing to consider claims

not articulated to the district court).

21