ACUSHNET COMPANY, Amtel Incorporated, AVX Corporation, Berkshire Hathaway Inc., Bridgestone/Firestone Inc., Brittany Dyeing and Printing Corp., Chamberlain Manufacturing Corp., Commonwealth Electrical Company, Commonwealth Gas Company, Emhart Industries Inc., Goodyear Tire & Rubber Co., Paramount Communications Incorporated, Teledyne Rodney Metals a division of Teledyne Industries Incorporated, United Dominion Industries Inc., Plaintiffs,

v.

COATERS INCORPORATED, Cornell–Dubilier Electronics, Dartmouth Finishing Corporation, Federal Pacific Electric Co., Fibre Leather Mfg. Co., Mohasco Corporation, Monogram Industries Incorporated dba American Flexible Conduit, New England Telephone & Telegraph Company, Nortek Incorporated, Ottaway Newspapers Inc., Revere Copper and Brass Incorporated, Revere Copper Products Incorporated, the City of New Bedford, Defendants.

Civil Action No. 93–11219–REK.

United States District Court,
D. Massachusetts.

July 24, 1996.

David M. Jones, Roger C. Zehntner, George H. Wilcox, Kirkpatrick & Lockhart, Boston, MA, William L. Lahey, Palmer & Dodge, Boston, MA, for Acushnet Company.

David M. Jones, Roger C. Zehntner, George H. Wilcox, Kirkpatrick & Lockhart, Boston, MA, for Amtel Incorporated, Berkshire Hathaway, Inc., Bridgestone/Firestone, Inc., Chamberlain Mfg. Corp., Com. Electrical Co., Com. Gas Co., Emhart Industries, Inc., Goodyear Tire & Rubber Co., Paramount Communications Inc., Teledyne Rodney Metals, United Dominion Industries, Inc., Brittany Dyeing & Printing Corp.

Mary K. Ryan, Nutter, McClennen & Fish, Boston, MA, David M. Jones, Irene C. Freidel, Roger C. Zehntner, George H. Wilcox, Kirkpatrick & Lockhart, Boston, MA, for AVX Corporation.

M. Frederick Pritzker, Wayne F. Dennison, Brown, Rudnick, Freed & Gesmer, Boston, MA, David M. Jones, Roger C. Zehntner, George H. Wilcox, Kirkpatrick & Lockhart, Boston, MA, for Brittany Dyeing and Printing Corp.

Donald D. Cooper, Hutchins, Wheeler & Dittmar, Boston, MA, for Coaters Incorporated.

William J. Cheeseman, George N. Lester, Foley, Hoag & Eliot, Boston, MA, for Cornell–Dubilier Electronics.

Alexander T. Bok, Boston, MA, Edward T. Dangel, III, Dangel, Donlan & Fine, Boston, MA, for Dartmouth Finishing Corporation.

John R. Quarles, Jr., Ralph N. Albright, Jr., Howard Weir, Morgan, Lewis & Bockius, Washington, DC, for Federal Pacific Electric Co.

David A. McLaughlin, McLaughlin & Folan, PC, New Bedford, MA, for Fibre Leather Mfg. Co.

Paul R. Mordarski, Morrissey & Hawkins, Boston, MA, George W. House, Reid L. Phillips, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, David C. Hawkins, Morrissey & Hawkins, Boston, MA, for Mohasco Corporation.

Gerald J. Petros, Hinckley, Allen, Snyder & Comen, Providence, RI, Larry J. Silverman, Takoma Park, MD, for Monogram Industries Incorporated.

Seth D. Jaffe, Anne D. Berlin, Jeffrey L. Roelofs, Foley, Hoag & Eliot, Boston, MA, for New England Tel. & Tel. Co.

Larry J. Silverman, Takoma Park, MD, for Nortek Incorporated.

Deming E. Sherman, Wesley J. Marshall, Edwards & Angell, Providence, RI, for Ottaway Newspapers, Inc.

James A.G. Hamilton, Lawrence G. Green, Perkins, Smith & Cohen, Boston, MA, for Revere Copper and Brass Inc., Revere Copper Products Incorporated.

Arthur J. Caron, Jr., City Solicitor, New Bedford, MA, for The City of New Bedford.

## OPINION

KEETON, District Judge.

### I.

### Nature of the Case

This is a complex civil action involving questions about the scope of liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675 (1995). The dispute among the parties to this action originated from the need to remedy toxic pollution in and around a former quarry at Sullivan's Ledge in New Bedford, Massachusetts. After operations as a stone quarry ceased, this area of Sullivan's Ledge (the "Site") was used for the disposal of hazardous and industrial waste from the 1930's until 1973.

After toxic pollutants were detected in the soil at the Site, in the soil of neighboring properties, and in adjacent water courses, the Environmental Protection Agency ("EPA") listed Sullivan's Ledge as a Super-

fund Site on the National Priorities List in 1984. The EPA then negotiated a settlement with a number of parties. The EPA claimed that the "settling parties" (also referred to in submissions before the court as the "Sullivan's Ledge Group" or "Plaintiffs") were at least partially responsible for the toxic pollution at the Site. The settling parties and the EPA devised a plan to remedy the contamination in and around the Site.

In this civil action, the Sullivan's Ledge Group is seeking compensation from a number of entities that allegedly contributed to the pollution at the Site but were not among the "settling parties." According to the Plaintiffs, the Defendants in this civil action disposed of hazardous waste at the Site and thus contributed to the Site's contamination. The Plaintiffs contend that the Defendants should reimburse the Sullivan's Ledge Group for at least part of the cost of remedying the pollution at Sullivan's Ledge.

## II.

### Rulings at the Hearing of June 11, 1996

At the hearing of June 11, 1996, the court orally ruled on many of the motions then pending. Before that hearing, almost all of the parties had filed motions for summary judgment in some form. The Plaintiffs had filed two separate motions for partial summary judgment, and various Defendants or groups of Defendants had filed six separate motions for summary judgment.

Of the motions for summary judgment or partial summary judgment ruled upon at the June 11th hearing, the court allowed only one motion, New England Telephone and Telegraph Company's Motion for Summary Judgment (Docket No. 200, filed February 15, 1996). The court stated orally its conclusions as to the undisputed material facts and applicable law, as well as a summary of the legal reasoning that led to the allowance of summary judgment for New England Telephone and Telegraph Company ("NETT"). This Opinion supplements and further explains the court's legal reasoning.

## III.

### Some Background Basic Facts

The Plaintiffs' claims against NETT stem from NETT's alleged disposal of utility pole "butts" at the Site.

The regular practice of NETT and other users of utility poles at all times relevant to the present case was that when old or damaged utility poles were retired from service and replaced, the poles being replaced were cut into sections. The part of the pole that had been in the ground while the pole was in service was known as the "butt" of the pole. When a discarded pole was retired from service and cut into sections, any section that included part of the butt of that pole was ordinarily disposed of by the disposal method for butts. Any section containing no part of the butt was usually disposed of by other methods. The sections containing no part of the butt did not contain any hazardous substances that are the subject of the remediation plan for Sullivan's Ledge.

It is uncontested that pieces of disposed utility poles are currently at the Site, some butts and some not. Plaintiffs claim that some of these pieces of utility poles are butts of poles that had belonged to NETT. Moreover, Plaintiffs have proffered affidavit and deposition testimony asserting that employees of NETT brought used pole butts to the Site for disposal. Finally, Plaintiffs claim that the pole butts that were discarded at the Site had been treated with creosote.

Creosote is a liquid used as a preservative to prevent wood from rotting. Liquid creosote contains chemicals known as Polycyclic Aromatic Hydrocarbons ("PAHs"). Several PAHs have been listed by the EPA as hazardous substances under CERCLA. 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4. Other PAHs are not listed.

For the purposes of this motion, NETT does not attempt to disprove that it disposed of pole butts at the Site. NETT also admits that during the relevant periods of time, some, but not all, of its telephone pole butts were treated with creosote before the poles were initially placed in service.

## IV.

### Plaintiffs' Legal Theory and its Relation to the Basic Facts

Under the Plaintiffs' theory of its case, NETT is liable to the Sullivan's Ledge Group because PAHs have leached from utility pole butts into the soil at the Site. Testing at the Site has confirmed that some of the soil in the former quarry is contaminated with high levels of PAHs. One of the elements of the remediation plan developed with the EPA addresses the level of PAHs in the soil at the site.

By no means, however, is the toxic pollution in and around Sullivan's Ledge limited to the presence of PAHs. In fact, the majority of the contamination that has migrated from the former quarry to neighboring properties and adjacent water courses consists of polychlorinated biphenyls ("PCBs"). Creosote does not contain PCBs, and there is no contention that utility pole butts have any connection to the PCB contamination in and around the Site.

PAHs in elevated levels have been detected only in the soil within the area of the former quarry, not in neighboring properties. Thus, the pollution at issue in this motion is limited to PAH contamination in the soil within the former quarry, itself.

## V.

### The Summary Judgment Standard Applicable When the Precise Terms of the Applicable Legal Test are in Dispute

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Not every factual controversy, however, will bar a court from entering summary judgment. The Supreme Court has placed emphasis on the words "genuine" and "material." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the require-

ment is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

■ This general statement of the standard for deciding a motion for summary judgment is alone inadequate guidance for a trial court's decision when the precise terms of the applicable legal test are in dispute. In such circumstances, the trial court may consider whether it is best to make its decision on that question relatively early rather than deferring final decision until the case has been fully prepared for trial at great expense to the parties and the public.

The First Circuit has provided added guidance for a trial court's consideration of this case management issue as well as more elaboration upon the meaning of the key phrases of the *Liberty Lobby* Opinion quoted above. For example, a recent First Circuit opinion stated:

> An issue is "genuine" only when the relevant evidence could lead a reasonable factfinder, drawing favorable inferences, to decide it in the manner described by the nonmoving party; a fact is "material" only when it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets. In this connection, it is important to remember that genuine disputes over material facts can only sprout out of competent and reasonably definite evidence actually contained in the summary judgment record.

*Roche v. John Hancock Mutual Life Ins. Co.,* 81 F.3d 249, 253 (1st Cir.1996) (citations omitted). Applying this standard, I conclude that there are no genuinely disputed material facts relevant to this motion.

■ In their final submission relating to NETT's motion, Plaintiffs, for the first time, asserted vague allegations that even if their legal theory against NETT is incorrect, they still have raised disputes of fact sufficient to defeat NETT's motion for summary judgment. *See* "Sullivan's Ledge Group's Statement of Disputed and Undisputed Facts in Opposition to the Motion of New England

Telephone and Telegraph Company for Summary Judgment and in Support of its Motion for Summary Judgment Against New England Telephone and Telegraph Company" (Docket No. 328, filed April 26, 1996). Under the appropriate standard explained above, however, I conclude that these new and vaguely phrased contentions are insufficient to cure the failure of Plaintiffs' previous submissions to present any genuine disputes of material fact. Thus, Plaintiffs' opposition to NETT's motion stands or falls not on disputes of fact but on the merit or lack of merit of the legal theory asserted (which, of course, we must look to for identification of the facts that are material).

## VI.

### Focusing Precisely a Dispute Over the Elements of the Substantive–Law Legal Test Applicable to this Case

The opposing parties have chosen to characterize the most basic dispute relevant to NETT's motion for summary judgment as a dispute over the substantive-law rule of causation applicable to a CERCLA claim of the type asserted by Plaintiffs against NETT. Because the parties have presented the issue in this way, I have fully examined their respective arguments under this label and under the legal reasoning applicable to issues of causation. I note at the outset, however, that some courts and commentators have treated issues of the type presented in this case under the label and under the legal reasoning applicable to questions of duty.

Legal tests regarding "causation" and legal tests regarding "duty" are two different modes for defining and limiting the scope of legal liability for conduct that is actionable, either on a fault basis or on a strict liability basis. Moreover, in addition to statutes, judicial opinions, and scholarly commentary that adopt exclusively one or the other of these two modes of reasoning, are other statutory provisions, judicial opinions, and scholarly commentary that examine issues in a particular kind of case through both of these perspectives. Yet a third method used in statutes, judicial opinions, and scholarly commentary is simply to characterize the issue as one of defining the scope and limits of liability consistently with manifestations in sources of authority (statutes and judicial opinions included) regarding the public policies underlying the applicable substantive-law rules. Finally, all three methods might be used in combination.

For reasons explained in later parts of this Opinion, all three methods of analysis support the same conclusion in this case: that NETT's motion for summary judgment is so firmly supported in all sources of authority that it would serve no meaningful purpose to delay ruling on the motion, and it should be allowed.

## VII.

### The Substantive–Law Legal Test

■ I begin, as have the parties in their submissions, with a consideration of causation issues in CERCLA litigation, both generally and more particularly in the specific type of CERCLA claim asserted by Plaintiffs against NETT.

NETT argues that the Plaintiffs must prove that NETT in some way *caused* the Plaintiffs to incur *"response costs,"* if Plaintiffs are to prevail in their claims for compensation under CERCLA. Moreover, NETT has proffered uncontradicted expert testimony asserting that NETT did not and, in fact, could not have caused the Plaintiffs to incur any "response costs," as those costs are defined under CERCLA.

NETT's expert testified that PAHs in used creosote-treated utility pole butts could not have leached into the surrounding soil to create a level of PAHs in the soil greater than the pre-existing background levels of PAHs already in the soil. Therefore, NETT asserts that the elevated levels of PAHs in the soil at the Site must have been caused by waste other than utility pole butts. NETT's expert testified that even if NETT disposed of creosote-treated utility pole butts at the Site, the butts could not have contributed to any *response costs* incurred by the Plaintiffs. The response costs that have been incurred (or as to which there is any evidentiary basis for determining that an actionable risk exists for incurring future response costs) have

been (and will be) required, not because of PAH levels to which NETT contributed in any way, but because of contamination as to which there is no proffer of evidence that NETT contributed in any way.

Plaintiffs have chosen not to make a frontal assault on the scientific basis for the opinions and conclusions of NETT's expert, though invited by the court to do so if they could proffer any reasoned basis for the challenge. Instead, plaintiffs have opposed the motion for summary judgment by attacking NETT's legal argument as to what Plaintiffs must prove—in other words, what are the elements of the applicable legal test that define and limit the scope of liability for any actionable form of conduct (either fault-based or strict liability).

Under the form of legal test proposed by Plaintiffs, they do not need to prove that a toxic substance in NETT's waste (PAHs, for example) caused them to incur *response costs*. Instead, Plaintiffs assert that the only elements they must prove are:

> (1) that the [defendant] generator disposed of waste material; (2) at a facility which contains hazardous substances of the type found in the defendant's waste; (3) there is a release or a threatened release of that *or any* hazardous substance; (4) which triggers the incurrence of response costs.

Docket No. 324 at 1–2 (citations omitted). In other words, Plaintiffs assert that they do not need to prove any connection between any toxic substance in NETT's waste and the response costs being incurred by a plaintiff. Under Plaintiffs' legal theory, as long as any response costs are being incurred by a plaintiff, any party that disposed of any hazardous substance is liable to compensate that plaintiff. It does not matter what type or amount of hazardous substance was disposed of by the party. Any hazardous substance in any quantity will open the floodgates of liability, and will do so even if the hazardous substance disposed of by the party is not causing any harm, is not threatening to cause any harm, and is not any part of the reason a response is needed and costs of that response are incurred.

In support of their theory for such far-reaching liability, the Plaintiffs have cited to what they characterize as: (1) the text of CERCLA, (2) judicial precedent from Courts of Appeals of various Circuits, and (3) traditional principles of tort law under strict liability. Parts VIII through X of this Opinion address each source of alleged legal authority cited by the Plaintiffs and explain why Plaintiffs' theory is not supported by statute, by precedent, or on policy grounds consistent with statutes and precedents.

## VIII.

### Manifestations of Meaning Within § 107 of CERCLA

*A. The text of § 107 of CERCLA*

The relevant portion of the text of § 107(a) of CERCLA is as follows:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels, or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable....

42 U.S.C. § 9607(a) (1995).

■ First, citing the maxim "when the words of a statute are unambiguous, the judicial inquiry is complete," Plaintiffs assert that causation is irrelevant in this case because "[a] causation requirement is not included within the plain language of section

107." Docket No. 324 at 2. This overstated argument defeats itself by purporting to prove too much. There are many requirements in CERCLA that, without a doubt, exist yet are not stated in the plain language of § 107. Silence of a statute on a particular matter is not conclusive as to the meaning of the statute in relation to that matter. Silence does not, itself, speak.

Something more than silence, associated with and helping to explain, is essential to manifesting meaning. More often than not, silence remains ambiguous with respect to most meanings asserted to be material. A litigant's argument that silence of one section or clause of a statute unambiguously manifests a particular meaning asserted by that litigant is usually insupportable. Plaintiffs' argument in this case, based on the asserted silence of § 107(a) on causation, is no exception. Viewing the matter most favorably to Plaintiffs, one can reasonably say no more than that the asserted silence is ambiguous, and for that reason, it is not alone conclusive against Plaintiffs' argument that no causation need be proved under CERCLA.

In fact, however, reading § 107 as if it were completely silent as to whether some limit is placed on the scope of liability under CERCLA is not even a plausibly reasonable interpretation. The text of subsection 107(a)(4) explicitly declares one kind of limit. It limits liability to response costs that are *caused* by a "release or a threatened release." As explained further below in Part IX, the First Circuit affirmed a summary judgment awarded to a defendant when the plaintiff was unable to prove that his response costs were *caused* by a release or a threatened release by the defendant. *Dedham Water Co. v. Cumberland Farms Dairy,* 972 F.2d 453 (1st Cir.1992). Thus, the text of § 107 does, in fact, include a causation requirement as to one form of limitation on the scope of liability.

### B. The structure of § 107 of CERCLA

Plaintiffs also assert that the structure of the statute as a whole supports their contention on causation. This argument is a purported adaptation of the statutory construction used by the Court of Appeals for the

Second Circuit in *State of New York v. Shore Realty Corp.,* 759 F.2d 1032 (2d Cir.1985). In that case, the Second Circuit stated:

> Interpreting section [107(a)] as including a causation requirement makes superfluous the affirmative defenses provided in section [107(b)], each of which carves out from liability an exception based on causation.

*Shore Realty Corp.,* 759 F.2d at 1044. I need not and do not, in deciding the matter before me at present, delve into whether this aspect of the decision in *Shore Realty Corp.* is consistent with First Circuit precedent that this court is bound to respect. I do note, however, that the relationship between § 107(a) and § 107(b) is sufficiently complex that § 107(b) need not necessarily be interpreted as impliedly negating the inference that § 107(a) imposes a restriction on scope of the prima facie case. Section 107(b) may very well address a different issue from that addressed by § 107(a) regarding what may be called affirmative defenses rather than elements of the prima facie theory of strict liability.

Section 107(b) of CERCLA explicitly establishes "defenses," and so designates them. As the Second Circuit noted, these defenses are related to causation:

> (b) Defenses
>
> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> (1) an act of God;
>
> (2) an act of war;
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised

due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b) (1995).

The exceptions listed in § 107(b) explicitly carve out from the *scope* of liability that might otherwise exist under § 107, any responsibility for parts of a practically indivisible harm if the party otherwise liable, and perhaps jointly liable, for some harm nevertheless makes the showing that another part of the harm was "solely caused" in one of the designated ways, and also meets other requirements (e.g. "he exercised due care").

A hypothetical case involving the meaning of § 107(b) illustrates this point. Subsection 107(b)(3) protects a defendant from liability if a release was caused by an unrelated third party and:

(a) he [the defendant] exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b). If there were no causation requirement inherent in strict liability imposed by the statute, then the implication of § 107(b) would be that a defendant would, prima facie, be subject to liability for not exercising due care over waste that had been produced by another and disposed of by another. Only by proving an affirmative defense would the defendant defeat that prima facie liability. The defendant would also be required to "take into consideration the characteristics" of that waste over which it had no control, and take precautions with respect to that waste of which it may well have had

no knowledge and no reasonable way of obtaining knowledge.

At a site like Sullivan's Ledge, applying Plaintiffs' proposed reading of § 107(b)(3) produces a result not explained on any reasoned ground—a kind of result that a court, respectful of legislation, should not interpret the legislation as mandating without any apparent supporting reason. In order for NETT to meet the requirements of § 107(b)(3) as Plaintiffs propose to read it, NETT would have had to police which entities were dumping waste into the Site and control every action taken at the Site to ensure that proper precautions were being taken. The record before me would not support a finding that NETT does now or ever did have the authority to police which actors would be permitted to dump and what wastes they would be permitted to dump at the Site. In fact, the undisputed historical facts in the record before this court support only the inference that neither NETT nor any other party knew then or currently knows what exactly was being dumped at Sullivan's Ledge. The absence from the scene of any person or authority to gather that information was the core of the problem of toxic waste accumulation of the scope that has occurred.

It makes sense to hold a party accountable for knowing about the characteristics of its own waste and for taking precautions against potential harm with respect to it. CERCLA contains no provisions, however, manifesting that the statute means that every person who ever dropped anything into a particular dump site is forever accountable for taking precautions with respect to unknown wastes dumped there by unknown other parties.

Moreover, in their argument regarding the exceptions to liability contained in § 107(b), the Plaintiffs failed to take into account the fact that exceptions such as these are not unique to CERCLA. In fact, exceptions to liability for acts of God, war, or unrelated third parties are characteristically part of common-law formulations of strict liability, as explained in Part X below. It is thus unlikely that the "defenses" have a special meaning and impact on causation under CERCLA when the same "defenses" do not have such

an effect on a common-law claim. *See* Part X below.

I conclude that Plaintiffs' argument based on the structure of the statute and the exceptions to liability in § 107(b) is without merit.

## C. The Legislative History of CERCLA

Plaintiffs' remaining argument under CERCLA is based on legislative history. Plaintiffs rely on what they characterize as the "deletion" of a phrase that was present in the original House bill but did not appear in the final version of the law. The original House bill would have imposed liability on "any person who caused or contributed to the release or threatened release" of a hazardous material. This precise phrase is not in CERCLA as enacted.

Plaintiffs also cite to the House Committee Report that accompanied the original House Bill. That committee report stated:

> The Committee intends that the usual *common* law principles of causation, including those of proximate causation, should govern the determination of whether a defendant "caused or contributed" to a release or threatened release.... [F]or liability to attach ..., the plaintiff must demonstrate a causal or contributory nexus between the acts of the defendant and the conditions which necessitated the response action....

H.R.Rep. No. 1016, 96th Cong., 2d Sess. 33 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6136–37. Plaintiffs do not cite, however, to any document that says anything about the non-existence of a phrase like this in the enacted CERCLA.

Plaintiffs have proffered no documentary support for their assertion that Congress, by not including a specific phrase like this in the enacted CERCLA, manifested a total rejection of any limitation on the scope of strict liability. Therefore, even if the court were to assume that it could properly draw *some* inference from the appearance of a phrase in the early version of a bill and the non-appearance of that phrase in the enacted form of the law, Plaintiffs have proffered no showing that the inference they propose to draw is the correct one. Another among the many plausible inferences is that the point was obvious enough that it did not need to be stated.

Plaintiffs' argument based on the non-appearance in the enacted CERCLA of a phrase from a House Bill never enacted is without merit.

## IX.

## Judicial Decisions

### A. First Circuit Decisions

Plaintiffs have cited numerous cases from federal courts at both the district and circuit levels. Close examination of the cases cited by the Plaintiffs, however, reveals two striking points.

First, in the First Circuit, no holding, or even obiter dictum, speaks to the precise question presented by this case.

Second, in framing their argument, Plaintiffs have extracted small passages out of the context in which they appeared and have woven these pieces together into an argument that is contradicted by a full reading, in context, of all the pronouncements of the Court of Appeals for the First Circuit on this subject.

It is true indeed that the First Circuit decisions upon which Plaintiffs have based their argument are relevant to the central issues in the present case, but none of the cases cited was closely similar to the present case, and none of the things said in those opinions was speaking about the distinctive issues of this case.

Contrary to the assertions of the Plaintiffs, in *O'Neil v. Picillo,* 883 F.2d 176 (1st Cir. 1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990), the First Circuit did not hold that "causation is not an element of liability." Docket No. 266 at 2. It is disappointing to a trial judge who values the advocacy of officers of the court to find such a misleading assertion about the holding of a higher court.

In fact, in *O'Neil,* the court did not even reach the issue of causation as an element of *liability;* it assumed that the district court's finding of liability was correct. The First

Circuit was not considering whether a limitation on liability in the form of some requirement of causation is an element of a claim that must be satisfied before any liability is imposed. Instead, on the assumption that a causation requirement is one of the elements *and it had been satisfied in this case*, the First Circuit was considering what further refinement of the causation element might be necessary in the *damages phase* of a CERCLA case when liability and damages were tried in separate phases. Also, the First Circuit was considering this issue in a CERCLA case initiated by the government.

In this context, *O'Neil* holds that the defendant has a burden to demonstrate that the harm is divisible, if it seeks to avoid joint and several liability for the entire harm. If the defendant can not demonstrate that the harm is divisible, then liability is joint and several for all response costs incurred by the government. *O'Neil*, 883 F.2d at 178–79.

The other two First Circuit cases most frequently cited by the Plaintiffs are *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146 (1st. Cir.1989) ("*Dedham I*"), and the follow-up case, *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453 (1st Cir.1992) ("*Dedham II*").

*Dedham I* involved pollution discovered in several of the plaintiff's water wells. As a result of the pollution, the plaintiff was forced to close several of its wells and build a water treatment plant. The plaintiff then sought to find the entity responsible for polluting the wells and hold it liable for the plaintiff's response costs. The defendant Cumberland Farms admitted to releasing pollutants, similar to those discovered in the wells, at a site not far from the polluted wells. The defendant produced evidence, however, showing that its pollutants had not actually reached the plaintiff's wells. In the first trial, the district court found, as a matter of fact, that the defendant's pollutants had not caused the contamination in the plaintiff's wells, and the court ordered judgment for the defendant.

The plaintiff in *Dedham I* appealed to the First Circuit, seeking to hold the defendant liable for its response costs even though the district court had found, as a matter of fact, that the defendant had not caused the actual contamination of the plaintiff's wells. As the First Circuit noted:

> The central question on appeal is whether, under CERCLA, the plaintiff must prove that a hazardous substance released by the defendant's facility *physically migrated onto plaintiff's property*, causing contamination of the well field, *or whether it is sufficient for the plaintiff to prove* that there were releases *or threatened releases of a hazardous substance from defendant's facility which caused the plaintiff reasonably to incur response costs*, regardless of whether physical migration actually occurred.

*Dedham I*, 889 F.2d at 1150 (emphasis added). In reversing and remanding the case to the district court, the First Circuit held that *actual contamination* of the plaintiff's property need not be proved, as long as plaintiff proved at least that threatened releases *caused plaintiff reasonably to incur response costs*.

The First Circuit did not hold in *Dedham I* that *causation* is not an element of the legal test for liability. It held that *actual contamination* is not an element. The court's later memorandum and order made this point crystal clear:

> The district court in this case held that the defendant's "releases" did not, in fact, contaminate the plaintiff's wells. But, the district court did not consider the additional question of whether defendant's releases (or threatened releases) might nonetheless have caused the plaintiff to incur "response costs" even though those releases did not *in fact* contaminate the wells. (A plaintiff, for example, might reasonably think that a particular release would prove likely to contaminate his wells and reasonably spend money to avoid the contamination even though no actual contamination occurs.)

*Dedham I*, 889 F.2d at 1157 (citation omitted) (emphasis in original). Thus, *Dedham I*, rather than supporting Plaintiffs' argument that there is no causation element in a CERCLA case, holds, exactly to the contrary, that a causal connection between the

waste discharged and the need for response costs must be proved.

No contention has been advanced in this case that the response costs incurred by the Sullivan's Ledge Group are the result of some release or threatened release by NETT that did not actually contaminate the Site. Rather, Plaintiffs allege that they do not need to prove any connection between NETT's waste and Plaintiffs' response costs. Plaintiffs assert that as long as they have incurred any response costs and NETT sent any hazardous material to the Site, then without anything more being proved, NETT is jointly and severally liable for the Plaintiffs' response costs.

On remand, the district court in the *Dedham Water* cases conducted further proceedings and found, as a matter of fact, that the response costs incurred by the plaintiff were not caused by any release or threatened release by the defendant. The focus of these further proceedings was "whether [the defendant], although not guilty of causing the discovered contamination, may nevertheless have posed an actionable threat of future contamination, to which [the plaintiff] responded in an objectively reasonable (if not costly) manner." *Dedham II*, 972, F.2d at 456. The Court of Appeals held: "[T]he [district] court's focus was exactly where it belonged ... on whether [the defendant] somehow, or in some way, caused [the plaintiff] to incur response costs." *Id.* at 460.

The First Circuit affirmed a judgment for the defendant, noting that "appellant had not proven an indispensable element of its remaining claim: causation." *Dedham II*, 972 F.2d at 464. Earlier in the opinion, the First Circuit used even stronger language about the need for proof of causation, noting that "without an affirmative finding of fact causally connecting [response costs] to a threat posed by [the defendant], the claim is necessarily stillborn." *Dedham II*, 972 F.2d at 460 n. 3.

### B. Precedent from Other Circuits

In effect, the ruling that Plaintiffs would have this court issue would necessitate the court's using only half, not all, of a test formulated by the Court of Appeals for the Third Circuit. The Second Circuit has also used this two-part test in actions initiated by the government. Of the many problems associated with Plaintiffs' attempt to import the Third Circuit test and apply it to this case, the most significant are the fact that Plaintiffs attempt to use only half of the test and Plaintiffs wish to extend the test to civil actions initiated by private parties as well as those initiated by the government.

In *United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir.1992), the Court of Appeals for the Third Circuit established a complex burden-shifting framework for analyzing cases initiated by the government under § 107 of CERCLA. In the first phase of the burden-shifting, the government is not required to prove a causal connection between the *hazardous waste* deposited by the defendant and the response costs:

> Accordingly, we reject [defendant's] argument that the Government must prove that [defendant's] emulsion deposited in the Borehole caused the release or caused the Government to incur response costs. Rather, the Government must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the *release* caused the incurrence of response costs.

*Alcan Aluminum Corp.*, 964 F.2d at 266. Contrary to Plaintiffs' suggestion, however, the Third Circuit's framework does not end at this point; the inquiry continues.

After the government has established a prima facie case, without proof of causal connection between a *defendant's waste* and response costs, the framework established by the Third Circuit shifts the burden to the defendant to show that its waste was not a cause of response costs.

> [I]f [the defendant] proves that the emulsion did not or could not, *when mixed with other hazardous wastes*, contribute to the release and the resultant response costs, then [the defendant] should not be responsible for *any* response costs. In this sense, our result thus injects causation into the equation but, as we have already point-

ed out, places the burden of proof on the defendant instead of the plaintiff.

*Alcan Aluminum Corp.,* 964 F.2d at 270.

In another case that the United States initiated against Alcan Aluminum Corp., the Second Circuit adopted the burden-shifting methodology used by the Third Circuit in its *Alcan* case, stating:

> [The defendant can] pay nothing if it can demonstrate that its pollutants, when mixed with other hazardous wastes, did not contribute to the release or the resulting response costs. In this respect we essentially adopt the Third Circuit's reasoning....

*United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 717 (2d Cir.1993). Thus, under the formulations employed by both the Second and Third Circuits, causal connection between a defendant's waste and the government's response costs is an element of liability, but a burden of proof is placed on the defendant.

Neither the Second nor the Third Circuits has decided whether the burden-shifting framework applies to actions initiated by private parties. The Eighth Circuit, on the other hand, specifically declined to adopt the Third Circuit's burden-shifting framework in an action initiated by a private party. *Farmland Indus. v. Morrison–Quirk Grain Corp.,* 987 F.2d 1335, 1340 (8th Cir.1993) ("a private party cannot predicate a claim for contribution or indemnity solely upon section 9607(a) liability to the government, but must also prove causation.")

The First Circuit has not yet decided a case in which a party has invoked this burden-shifting framework. I conclude that I need not address this issue, or address in detail a possible conflict among circuits, because in any event, I conclude that it is unlikely that the First Circuit will impose a burden-shifting framework *such as Plaintiffs propose.* What Plaintiffs propose is both a more sweeping elimination of causation as an element of the legal test for liability and an extension to actions brought by private parties, of a rule thus far developed only for actions brought by the government for recovery of its response costs.

Moreover, even if a burden were placed on NETT to prove that its waste did not or could not have caused the Plaintiffs' incurrence of response costs, NETT has proffered evidence sufficient to meet that burden. In their evidentiary submissions in response to NETT's motion, Plaintiffs have not challenged NETT's proffered submissions of allegedly undisputed facts. Rather, Plaintiffs have argued that only the first-half of the Third Circuit's burden shifting framework should be used—effectively eliminating entirely the causation element that remains as part of the completion of the burden-shifting framework.

Plaintiffs' proposed construction of the elements of liability under CERCLA is not supported by the precedent of any Circuit.

## X.

## Common–Law Precedents

■ Plaintiffs also argue that their position is supported in common-law developments, but this contention, also, is without merit. The fact that CERCLA establishes a version, or perhaps multiple versions, of strict liability does not mean that causation is irrelevant. Strict liability often has been called "liability without fault." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 75 at 534 (5th ed. 1984). Strict liability is not, however, and never has been, "liability without causation." The phrase "liability without fault" signifies that in the instances where the common-law imposes strict liability, an actor can be held liable for the injury that the actor causes even if the actor neither intended to injure the victim nor was negligent in injuring the victim.

> [A]s that term is commonly used by modern courts, [strict liability] means liability that is imposed on an actor apart from either (1) an intent to interfere with a legally protected interest without legal justification for doing so, or (2) a breach of a duty to exercise reasonable care, i.e., actionable negligence.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 75 at 534 (5th ed. 1984). In the paradigm strict liability situation, an actor may be held liable for injury

that the actor caused even though the actor took every possible precaution to avoid the injury.

Common-law precedents before the Twentieth Century had identified only limited circumstances in which strict liability was imposed. They included, for example, liability imposed upon a keeper of wild animals and the much debated doctrine of *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868) (uncommonly dangerous things and activities). Twentieth Century common-law precedents have added to this list of illustrations. In each of these limited areas where liability is strict, however, defendants are accountable only for the injuries that, for example, their kept wild animals, their abnormally dangerous activities, or their defective products, have caused. These forms of strict liability are still a part of the law of torts, and they do not dispense with the requirements of cause in fact and proximate cause—elements traditionally a part of every action in tort.

Even a case relied on by the Plaintiffs acknowledges the difference between holding that liability is strict and holding that causation need not be proved.

> We pause to note the distinction between whether § 9607(a) imposes strict liability and whether it requires a showing of causation. That is to say, finding that § 9607(a) imposes strict liability does not rebut [defendant's] causation argument. Traditional tort law has often imposed strict liability while recognizing a causation *defense.*

*State of N.Y. v. Shore Realty Corp.,* 759 F.2d 1032, 1044 n. 17 (2d Cir.1985) (emphasis added). *See* Part IX above regarding the lawmaking choice between treating causation as an element of the legal test for liability and treating lack of causal connection as a defense.

The Restatement (Second) of Torts documents the several areas in which the common-law imposes strict liability and also defines the limitations on the scope of strict liability. For example, within the scope of "abnormally dangerous activities," the common-law imposes strict liability only for risks associated with the danger posed by the abnormally dangerous character of the activity:

§ 519.  General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

*Restatement (Second) of Torts* § 519 (1977). As comment e to the above section of the Restatement explains:

> [T]he transportation of dynamite or other high explosives by truck through the streets of a city is abnormally dangerous.... If the dynamite explodes in the course of transportation, a private person transporting it is subject to liability under [strict liability], although he has exercised the utmost care. On the other hand, if the vehicle containing the explosives runs over a pedestrian, he cannot recover unless the vehicle was driven negligently.

*Restatement (Second) of Torts* § 519 cmt. e (1977). The scope of strict liability is defined and limited by the scope of the risk that is the basis for imposing strict liability in the first place.

The risk that CERCLA addresses, broadly stated, is the risk of pollution caused by toxic waste. Entirely compatible with common-law precedents is an interpretation of CERCLA as having established a regime of strict liability under which ordinarily a defendant will be held liable for any pollution caused by its waste, even if that defendant took every possible precaution to prevent its waste from causing pollution. The scope of this liability, however, is both defined and limited in ways consistent with common-law precedents regarding other forms of strict liability.

Interpreting the form of strict liability established by CERCLA as consistent with common-law precedent is supported by § 107(b) of the statute, discussed in Part IX, above. Section 107(b) sets forth specific "defenses" to liability under § 107(a) for acts of God, war, and unrelated third parties. Significantly, the exceptions to liability included in § 107(b) of CERCLA are consistent with

common-law formulations of strict liability. *Cf. Restatement (Second) of Torts* § 504(3)(c) (1977) ("The liability [for trespass of live-stock] does not extend to harm ... brought about by the unexpectable operation of a force of nature, action of another animal or intentional, reckless or negligent conduct of a third person."); *Restatement (Second) of Torts* § 510 (1977) ("The possessor of a wild animal or an abnormally dangerous domestic animal is subject to strict liability, although it would not have occurred but for the unex-pectable (a) innocent, negligent or reckless conduct of a third person, or (b) action of another animal, or (c) operation of a force of nature."). Thus, it is possible that by includ-ing the exceptions in § 107(b), Congress may have merely been choosing which of the vari-ous common-law formulations should apply to the CERCLA regulatory scheme.

Section 107 of CERCLA can be interpret-ed consistently with common-law formula-tions of strict liability. Such an interpreta-tion, however, does not support Plaintiffs' arguments regarding causation.

### Conclusion

For the reasons stated in this Opinion, as well as the determinations of undisputed fact and conclusions stated in open court at the hearing of June 11, 1996, I conclude that Plaintiffs' argument regarding causation un-der § 107 of CERCLA is unsupported in law. Defendant NETT has proffered uncontra-dicted evidence showing that it did not, and could not, have caused any response costs the Plaintiffs have already incurred or will incur in the future. Because the Plaintiffs have failed to proffer any challenge to this evi-dence sufficient to show a genuine dispute of material fact, the Defendant NETT's motion for summary judgment is allowed.

### Interlocutory Order

For the reasons stated orally on the record on June 11, 1996, and in the foregoing Opin-ion, it is ORDERED:

(1) Defendant NETT's Motion for Sum-mary Judgment (Docket No. 200, filed Feb-ruary 15, 1996) is ALLOWED.

(2) No party having shown cause for entry of a Separate Final Judgment, this is an Interlocutory Order.